**No. 23-55116**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

BETH BOWEN,

*Plaintiff-Appellant*

v.

ENERGIZER HOLDINGS, INC., ET AL.,

*Defendants-Appellees*.

Appeal from the United States District Court for the Central District of
California
No. 2:21-CV-04356-MWF-AGR
Hon. Michael W. Fitzgerald

_____

**APPELLEES' ANSWERING BRIEF**

_____

John Moticka
STINSON LLP
7700 Forsyth Blvd, Suite 1100
St. Louis, Missouri 63105
Telephone:     314.259.4562
john.moticka@stinson.com

Megan McCurdy
J. Emmett Logan
Ashley Crisafulli
STINSON LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106
Telephone:   816.842.8600
megan.mccurdy@stinson.com
emmett.logan.stinson.com
ashley.crisafulli@stinson.com

*Attorneys for Appellees Energizer Holdings, Inc., Edgewell
Personal Care Company, Edgewell Personal Care Brands, LLC,
Playtex Products, LLC, and Sun Pharmaceuticals, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees make the following corporate disclosures:

Defendant-Appellee Energizer Holdings, Inc. states that it does not have a parent corporation. The Vanguard Group, Inc. owns more than ten percent (10%) of Energizer Holdings, Inc.'s stock.

Defendant-Appellee Edgewell Personal Care Company states that it does not have a parent corporation. The Vanguard Group, Inc. and BlackRock Inc. own more than ten percent (10%) of Edgewell Personal Care Company's stock.

Defendant-Appellee Edgewell Personal Care Brands, LLC states that its sole member is Edgewell Personal Care Company.

Defendant-Appellee Playtex Products, LLC states that its sole member is Edgewell Personal Care Brands, LLC.

Defendant-Appellee Sun Pharmaceuticals, LLC states that its sole member is Playtex Products, LLC.

Date: July 14, 2023                     Stinson LLP

                                        s/ *Megan McCurdy*

                                        Megan McCurdy

                                        *Attorney for Appellees Energizer Holdings, Inc.,*
                                        *Edgewell Personal Care Company, Edgewell*
                                        *Personal Care Brands, LLC, Playtex Products,*
                                        *LLC, and Sun Pharmaceuticals, LLC*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................3

STATEMENT OF THE CASE...............................................................................4

   Plaintiff's Allegations.............................................................................................4

   The District Court's Orders of Dismissal..............................................................7

SUMMARY OF ARGUMENT ..............................................................................9

   STANDARD OF REVIEW...............................................................................11

ARGUMENT .......................................................................................................12

   I.     PLAINTIFF LACKS STANDING. .......................................................12

   II.   PLAINTIFF'S SUBJECTIVE BELIEF THAT THE PRODUCTS CONTAIN UNACCEPTABLE LEVELS OF BENZENE IS CONTRADICTED BY FDA GUIDANCE. ........................................................................................14

      A.   The FDA has Determined that Drug Products with Benzene Levels of Less than Two Parts Per Million Are Acceptable. ....................................................14

      B.   The ICH Q3C Standards Do Not Prohibit Benzene in Sunscreen Products. 18

   III.   COURTS FOLLOW FDA DETERMINATIONS. ....................................21

      A.   Because the FDA has Determined the Benzene Level the Products Allegedly Contain Is Acceptable, Plaintiff Cannot State a Cognizable Claim of Economic Injury....................................................................................................22

      B.   The District Court Properly took Judicial Notice of the 2021 and 2022 Issuances....................................................................................................................27

      C.   The District Court Properly Interpreted the FDA Issuances......................30

      D.   The Cases on which Plaintiff Relies Do Not Carry her Argument that Interpretation of FDA Guidance Is for a Jury.................................................34

      E.   Plaintiff Was Not Entitled to Discovery. ..................................................37

   IV.   ALLEGING AN ATTENUATED RISK OF HARM DOES NOT STATE A CLAIM OF ECONOMIC INJURY. ...................................................................40

V.    PLAINTIFF HAS NO STANDING WITH RESPECT TO PRODUCTS SHE DOES NOT ALLEGE CONTAINED BENZENE. ...................................45

   A.  Plaintiff has No Standing with Respect to Products in which No Benzene Has Been Detected. .......................................................................45

   B.  Plaintiff has No Standing with Respect to the SPF 100 Product. ..............46

   C.  Plaintiff has No Standing with Respect to Products she Did Not Purchase. 52

CONCLUSION ........................................................................................54

Certificate of Compliance ......................................................................546

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alliance for the Wild Rockies v. Petrick*,
  68 F.4th 475 (9th Cir. 2023) .................................................................2

*Andrade-Heymsfield v. Danone US, Inc.*,
  No. 3:19-cv-589, 2019 WL 3817948 (S.D. Cal. Aug. 14, 2019),
  *app. dismissed*, No. 19-56082, 2020 WL 5513552 (9th Cir. 2020) .......22, 23, 28

*BBK Tobacco & Foods, LLP v. U.S. Food & Drug Admin.*,
  672 F. Supp. 2d 969 (D. Ariz. 2009) ...........................................32, 33

*Birdsong v. Apple, Inc.*,
  590 F.3d 955 (9th Cir. 2009) ..............................................................40

*Blackburn v. Champions Petfoods USA, Inc.*,
  No. 1:18-cv-00038, 2021 WL 9682169 (S.D. Iowa Aug. 12, 2021)............42, 48

*Bodle v. Johnson & Johnson Consumer Inc.*,
  No. 3:21-cv-07742-EMC, 2022 WL 18495043 (N.D. Cal., Feb. 24,
  2022) ...............................................................................21, 41, 47, 50

*Boschetto v. Hansing*,
  539 F.3d 1011 (9th Cir. 2008) ...........................................................38

*Boysen v. Walgreen Co*.,
  No. 3:11-cv-06262-SI, 2012 WL 2953069 (N.D. Cal. July 19,
  2012) ...................................................................... 14, 24, 25, 26, 29, 32, 37, 42

*Bruton v. Gerber Prod. Co.*,
  No. 5:12-cv-02412, 2014 WL 172111 (N.D. Cal. Jan. 15, 2014) .....................53

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*,
  788 F.2d 535 (9th Cir. 1986) .............................................................38

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
    No. 3:10-cv-1044, 2011 WL 159380 (N.D. Cal. Jan. 10, 2011),
    *aff'd on other grounds,* 475 F. App'x. 113 (9th Cir. 2012),
    *abrogated on other grounds*, *Hawkins v. Kroger Co.*, 906 F.3d 763
    (9th Cir. 2018)................................................................52

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
    631 F.3d 939 (9th Cir. 2011) ..........................................12

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)........................................................29

*Christensen v. Harris Cty.*,
    529 U.S. 576 (2000)........................................................29

*Clinger v. Edgewell Personal Care Brands, LLC*,
    No. 3:21-cv-1040, 2023 WL 2477499 (D. Conn. March 13, 2023)......34, 35, 36,
    46, 49, 50

*Coffelt v. Kroger Co.*,
    No. 5:16-cv-1471, 2018 WL 6004543 (C.D. Cal. Aug. 17, 2018)....................42

*Cristia v. Trader Joe's Co.*,
    No. 1:22-cv-1788, 2022 WL 17551552 (N.D. Ill. Dec. 9, 2022).................25, 29

*Degelmann v. Advanced Medical Optics, Inc.*,
    659 F.3d 835 (9th Cir. 2011), *vacated* 699 F.3d 1103 (9th Cir.
    2012) ..........................................................................27

*Doss v. Gen. Mills, Inc.*,
    No. 0:18-cv-61924, 2019 WL 7946028 (S.D. Fla. June 14, 2019),
    *aff'd*, 816 F. App'x. 312 (11th Cir. 2020) ....................................42, 48

*Friends of the Earth, Inc. v. Laidlaw Environ. Svcs (TOC), Inc.*,
    528 U.S. 167 (2000)........................................................12

*In re Fruit Juice Products Marketing Sales and Practices Litig.*,
    831 F. Supp. 2d 507 (D. Mass. 2011)....................................25

*Gagetta v. Walmart, Inc.*,
    --- F. Supp. 3d ---, No. 3:22-cv-3757, 2022 WL 17812924 (N.D.
    Cal. Dec. 19, 2022) ..........................................34, 37, 51

*Gaminde v. Lang Pharma Nutrition, Inc.*,
    No. 1:18-cv-300, 2019 WL 1338724 (N.D.N.Y. Mar. 25, 2019).......................48

*Granfield v. NVIDIA Corp.*,
    No. 3:11-cv-5403, 2012 WL 2847575 (N.D. Cal. July 11, 2012)......................52

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ...............................................................44

*Hamman v. Cava Group., Inc.*,
    No. 3:22-cv-593, 2023 WL 3450654 (S.D. Cal. Feb. 8, 2023) .........................44

*Harris v. Board of Supervisors, Los Angeles County*,
    366 F.3d 754 (9th Cir. 2004) ..................................................42, 43, 44

*Hayashi v. Red Wing Peat Corp.*,
    396 F.2d 13 (9th Cir. 1968) ...............................................................37

*Henning v. Luxury Brand Partners, LLC*,
    No. 3:22-cv-7011-TLT, 2023 WL 3555998 (N.D. Cal. May 11,
    2023) ............................................................................28, 34, 35

*Huertas v. Bayer*,
    No. 2:21-cv-20021, 2022 WL 3572818 (D.N.J. Aug. 19, 2022) .................24, 32

*Huertas v. Bayer*,
    No. 2:21-cv-20021, 2023 WL 3773139 (D.N.J. May 23, 2023) .......................47

*Hughes v. Chattem, Inc.*,
    818 F. Supp. 2d 1112 (S.D. Ind. 2011).................................................42

*John v. Whole Foods Market Group, Inc.*,
    858 F.3d 732 (2d Cir. 2017) ...............................................................49

*Kimca v. Sprouts Markets, Inc.*,
    No. 2:21-cv-12977, 2022 WL 1213488 (D.N.J. April 25, 2022)......................42

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x. 257 (3d Cir. 2010) ...........................................13, 23, 25

*LeGrand v. Abbott Lab'ys*,
    --- F. Supp. 3d ---, No. 3:22-cv-5815, 2023 WL 1819159 (N.D.
    Cal. Feb. 23, 2023)..........................................................................52, 54

*Little v. City of Seattle*,
863 F.2d 681 (9th Cir. 1988) ..............................................................38

*Lorentzen v. Kroger Co.*,
532 F. Supp. 3d 901 (C.D. Cal. 2021) ................................................53

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................................................................12, 13

*Martinez v. Mead Johnson & Co.*,
LLC, No. 5:22-cv-00213, 2022 WL 15053334 (C.D. Cal. Oct. 22,
2022), *app. dismissed*, No. 23-55141 (9th Cir. 2023) ................................22, 28

*Miller v. Ghiradelli Chocolate Co.*,
912 F. Supp. 2d 861 (N. D. Cal. 2012).......................................52, 53

*Moore v. Trader Joe's*,
4 F.4th 874 (9th Cir. 2021) ................................ 21, 22, 28, 29, 31, 32, 33, 34, 36

*Onaka v. Shiseido Americas Corp.*,
No. 1:21-cv-10665, 2023 WL 2663877 (S.D.N.Y. Mar. 28, 2023) ...................48

*Pels v. Keurig Dr. Pepper, Inc.*,
No. 3:19-cv-03052, 2019 WL 5813422 (N.D. Cal. Nov. 7, 2019) ...................48

*Scruggs v. Mars, Inc.*,
No. 2:22-cv-5617, 2023 WL 3668706 (C.D. Cal. May 22, 2023) .....................30

*Seaman v. Seacor Marine, LLC*,
326 F. App'x. 721 (5th Cir. 2009)......................................................23

*Schloegel v. Edgewell Personal Care Co.*,
No. 4:21-cv-00631-DGK, 2022 WL 808694 (W.D. Mo. Mar. 16,
2022) .............................................................................................41, 47

*Song v. Champion Petfoods, Inc., USA, Inc.*,
No. 0:18-cv-3205, 2020 WL 7624861 (D. Minn. Dec. 22, 2020)....................48

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................................................................12, 46

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ..............................................................31

*Standard Ins. Co. v. Saklad*,
    127 F.3d 1179 (9th Cir. 1997) .......................................................2

*Vera v. Bureau of Indian Affairs*,
    738 F. App'x. 431 ((9th Cir. 2018) ..........................................38, 39

*Wallace v. ConAgra Foods, Inc.*,
    747 F.3d 1025 (8th Cir. 2014) .........................................41, 42, 47

*Whitewater Draw Whitewater Draw Nat. Res. Conservation Dist. v.*
    *Mayorkas*, 5 F.4th 997 (9th Cir. 2021) .........................................11

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990).......................................................................12

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
    --- F. Supp. 3d ---, No. 20-MD-2924, 2022 WL 17480906 (S.D.
    Fla. Dec. 6, 2022).........................................................................23

**Statutes**

21 U.S.C. § 321(g)(1)(B) ....................................................................18, 34

21 U.S.C. § 351 ..........................................................................................2

21 U.S.C. § 352 ..........................................................................................2

21 U.S.C. § 387g(a)(1)(A) .......................................................................33

28 U.S.C. § 1346 ........................................................................................2

28 U.S.C. § 1332(d)(2)...............................................................................3

29 U.S.C § 1291 ......................................................................................3, 5

Cal. Bus. & Prof. Code § 1750, et seq. .....................................................6

Cal. Bus. & Prof. Code § 17500, et seq. ...................................................6

Cal. Bus. & Prof. Code, § 17200, et seq. ..................................................6

**Regulations**

21 C.F.R. § 201 ..........................................................................................2

21 C.F.R. § 210.3(b)(3)................................................................20

21 C.F.R. § 210.3(b)(7)................................................................19

21 C.F.R. § 210.3(b)(8)................................................................20

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................... 2

Fed. R. Civ. P. 12(b)(1)..........................................................11, 32

Fed. R. Evid. 201(b)...............................................................28, 30

**Other Authorities**

*Employ, Merriam-Webster*, available at: https://www.merriam-
    webster.com/dictionary/employ (last accessed July 13, 2023) .........................19

*FDA alerts drug manufacturers to the risk of benzene contamination
    in certain drugs,* FDA, Dec. 23, 2022, available at:
    https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-
    alerts-drug-manufacturers-risk-benzene-contamination-certain-
    drugs (last accessed July 13, 2023) (the "2021 Issuance") ...............16

*Field Alert Report Submission Questions and Answers Guidance for
    Industry*, FDA, July 2021, available at:
    https://www.fda.gov/media/114549/download (last accessed July
    13, 2023) .................................................................17, 18

Final Bulletin for Agency Good Guidance Practices, 72 FR 3434 (Jan.
    25, 2007) ........................................................................28

*Frequently Asked Questions on Benzene Contamination in Drugs*,
    FDA, June 9, 2022, available at: https://www.fda.gov/drugs/drug-
    safety-and-availability/frequently-asked-questions-benzene-
    contamination-drugs (last accessed July 13, 2023) (the "2022
    Issuance")................................................................17, 21

*Impurities: Guideline for Residual Solvents Q3C(R8)*, International counsel for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use, 2021, available at: https://database.ich.org/sites/default/files/ICH_Q3C-R8_Guideline_Step4_2021_0422_1.pdf (last accessed July 13, 2023) ("ICH Q3C Standards")..................................................15, 18, 19, 20, 21

*Residual Solvents in Drug Products Marketed in the United States*, FDA, Nov. 2009, available at: https://www.fda.gov/media/70928/download (last accessed July 13, 2023) (the "2009 Issuance") ......................................................15, 21, 28, 30

## INTRODUCTION

Plaintiff's Opening Brief begins with her defense of a consumer's putative right to sue to protect an "unusual or even 'absurd'" decision that "necessarily affects the consumer in a personal and individual way." Opening Br. at 1. But Article III requires more than an "unusual" or "absurd" belief something is harmful. It requires a plausible basis for the allegation that a product plaintiff purchased was worth less than what she paid because it contains levels of a substance that exceed an objective standard of harm. Where – as here – the United States Food and Drug Administration (the "FDA") has determined what levels of the substance are acceptable, those determinations set the objective standard. The allegation that substances contained in a product are unacceptable, based on Plaintiff's unusual or absurd belief, does not establish injury-in-fact.

Plaintiff's claims rest on her assertions that there is no acceptable level of benzene in sunscreen products. The FDA, however, has determined that the trace levels of benzene Plaintiff alleges were present in the subject products are acceptable and supported by safety data and, therefore, that products containing benzene at those levels can be distributed by manufacturers and can be used by consumers. Courts consistently hold that, where the FDA has determined that substance levels in a product are acceptable, a plaintiff cannot plausibly allege

economic injury as a result of a belief that the product contains unsafe levels of the substance.

Here, therefore, the district court properly concluded that Plaintiff failed to adequately plead Article III standing and dismissed the action for lack of subject matter jurisdiction.[1]

## JURISDICTIONAL STATEMENT

Plaintiff mistakenly asserts that the "district trial court has original subject matter jurisdiction over this case because the United States is a defendant pursuant to 28 U.S.C. § 1346." Opening Br. at 3. The United States is not a defendant.

---

[1] The Second Amended Complaint (the "SAC") was also subject to dismissal because (1) Plaintiff's claims are preempted by the Food Drug and Cosmetic Act, 21 U.S.C. §§ 351, 352; 21 C.F.R. § 201; (2) Plaintiff's claims are subject to the primary jurisdiction of the FDA; (3) Plaintiff fails to meet the heightened pleading requirement of Rule 9(b); (4) Plaintiff fails to state a claim for relief because a reasonable consumer would not believe advertising or labels that comply with FDA requirements and guidelines for trace amounts of benzene are misleading; (5) Plaintiff failed to state an express warranty claim; (6) the economic loss doctrine bars Plaintiff's common law claims; (7) Plaintiff failed to state strict product liability claims; and (8) Plaintiff's equitable claims fail because she does not allege that she lacks an adequate remedy at law. The district court, having determined that it lacked subject matter jurisdiction, did not reach those issues. There are no extraordinary circumstances that would call for the Court to reach those issues on this appeal. *See Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 n.4 (9th Cir. 2023) ("We generally do not resolve issues that the district court did not first reach."); *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1180 n.1 (9th Cir. 1997) (an issue that "was not decided by the district court … is not properly before us."). Defendants, therefore, have not briefed the issues here. Defendants will raise them, if necessary, at the proper time.

Plaintiff alleged that the district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). 3-ER-359 at ¶ 2. Because Plaintiff lacks Article III standing, however, the district court did not have subject matter jurisdiction.

Plaintiff also asserts: "This Court has jurisdiction pursuant to 29 U.S.C § 1291." Opening Br. at 3. Defendants agree that the Court has jurisdiction over this appeal. The basis for the Court's jurisdiction is 28 U.S.C § 1291, because the appeal is taken from a final judgment of the district court that disposes of all parties' claims.

The district court entered judgment on January 5, 2023. 1-ER-002–018. Plaintiff filed her Notice of Appeal on February 3, 2023. 4-ER-851–871.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Did the district court correctly take judicial notice of guidance issued by the FDA?

2.  Did the district court correctly hold that interpretation of FDA guidance is an issue of law for the court, not an issue of fact for the jury?

3.  Did the district court correctly hold that Plaintiff has not plausibly alleged that Defendants employed benzene in the Products?

4.  Did the district court correctly hold that the FDA has determined that, where benzene is not employed in the manufacture of drug substances, 2 ppm is an acceptable level of benzene in drug products?

5.  Did the district court correctly hold that Plaintiff did not state a claim of economic injury based on allegations that a product may be harmful because it contains a concentration of a substance the FDA has determined to be acceptable?

6.  Did the district court correctly hold that Plaintiff did not state a claim of economic injury based on allegations that a product may be harmful because of the hypothetical possibility it may contain a concentration of a substance the FDA has determined to be acceptable?

7.  Did the district court correctly hold that Plaintiff did not state a claim of economic injury based on the hypothetical risk that a product she purchased is unsafe?

8.  Did Plaintiff state a claim of economic injury based on products she did not purchase?

## STATEMENT OF THE CASE

### Plaintiff's Allegations

The SAC alleges that, between 2017 and 2020, Plaintiff purchased Banana Boat® Ultra Sport Sunscreen SPF 100 (the "SPF 100 Product"), Banana Boat® Ultra Sport Sunscreen SPF 50 (the "SPF 50 Product"), and Banana Boat® Ultra

Sport Sunscreen SPF 30 (the "SPF 30 Product") (together the "Products"). 3-ER-360 at ¶ 5. Plaintiff retained and submitted for testing one container of the SPF 50 Product. 3-ER-362 at ¶ 8. The test indicated that the Product in that container had 0.29 parts per million ("ppm") of benzene. *Id*. Plaintiff did not submit for testing any of the other Products she purchased.

"Valisure LLC and ValisureRX LLC ('Valisure'), an analytical pharmacy, ran tests on a variety of Defendants' Sunscreen Products." 3-ER-370 at ¶ 27. Plaintiff alleges that "Valisure's testing revealed that Banana Boat Ultra Sport Sunscreen SPF 100—the same product purchased by Plaintiff—also contained >0.1 ppm benzene." 3-ER-362 at ¶ 8. The Valisure Petition on which Plaintiff relies, however, includes test results for a sample of three different Banana Boat® sunscreens with SPF of 100. None match the description of the SPF 100 Product in the SAC. For Banana Boat® Ultra Sport Sunscreen Lotion SPF 100, Valisure's tests showed no detectable level of benzene. 2-ER-221. For Banana Boat® Ultra Sport Clear Sunscreen Spray SPF 100, Valisure's tests showed .15 ppm of benzene. 2-ER-213. For Banana Boat® Ultra Defense® Ultra Mist Clear Sunscreen Spray SPF 100, Valisure's tests indicated a level of benzene of less than .10 ppm. 2-ER-214.

Plaintiff does not allege that Valisure tested any batch of the SPF 30 Product and Valisure's report does not reflect any such test.

Plaintiff does not allege that the Products caused her any physical injury, that the Products did not protect her from sunburn, or that she was forced to discard any portion of the Products. Instead, Plaintiff attempts to state an injury in fact by alleging that, had she known that *some* batches of *some* Banana Boat® sunscreen products contain trace levels of benzene, "she would not have purchased and used the [P]roducts at all or would have paid significantly less for them." 3-ER-360 at ¶ 6.

Plaintiff alleges violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, et seq., California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq., and California's Consumers Legal Remedies Act Cal. Bus. & Prof. Code § 1750, et seq., unjust enrichment, negligent misrepresentation/omission, breach of express warranty, breach of implied warranty, strict product liability—failure to warn, and strict product liability—manufacturing defect. 3-ER-383–400. She seeks damages, an order enjoining Defendants from selling all sunscreen products, an order enjoining Defendants "from suggesting or implying that their Sunscreen Products are safe and effective for human application," an order requiring Defendants "to engage in a corrective advertising campaign," a declaratory judgment, restitution, disgorgement, attorneys' fees, and costs. 3-ER-401.

**The District Court's Orders of Dismissal**

Plaintiff commenced the action on May 25, 2021. 4-ER-784–830. Before Defendants responded to the Complaint, Plaintiff filed her First Amended Complaint. 4-ER-754–783. Defendants then moved to dismiss the Amended Complaint. 4-ER-667–753. The district court granted the Motion. *Id*.; 3-ER-403–410. It held: "Plaintiff has not adequately alleged a particularized injury sufficient to give her standing, as she does not allege that the sunscreen she purchased was from a batch contaminated with benzene or that her sunscreen actually contained benzene, only that there was some possibility of the sunscreen containing benzene." 3-ER-403. The court acknowledged that Plaintiff had alleged that Valisure had found some of Defendants' sunscreen products to contain benzene, but pointed out:

> The FAC does not allege that Valisure extrapolated its statements more broadly, such as across all of Defendants' sunscreen products, such that there is a basis for questioning whether the sunscreen Plaintiff purchased contained benzene. Plaintiff also does not allege that she had her sunscreen specifically tested and found that it contained benzene.

3-ER-408–409. Plaintiff's claim, therefore, was "based on the **hypothetical** possibility that the products she purchased **may** have contained benzene – not that she purchased a product that demonstrably did contain benzene, such as from a batch identified by Valisure." 3-ER-409 (emphasis by the Court). The court, however, granted Plaintiff leave to amend. 3-ER-410.

Plaintiff next filed the SAC. 3-ER-357–402. Defendants again moved to dismiss. 2-ER-145–318; 3-ER-320–356. The district court again granted the Motion. *Id*.; 1-ER-002–018. The court stated:

> Plaintiff's Second Amended Complaint does not remedy the failure to plead a particularized injury stemming from her purchase of Ultra Sport 30 and Ultra Sport 100. She still does not allege that her purchased Ultra Sport 30 and Ultra Sport 100 actually or plausibly contained benzene.

1-ER-006.

As to Plaintiff's allegations that Valisure had tested a sample of a product that has a name similar to the SPF 100 Product, the court held that "Plaintiff does not allege that Valisure's discovery can be extrapolated across all of Defendants' products or to a specific batch which could have ended up in her purchased sunscreen." 1-ER-007. The court added that because of the "FDA guideline—the 2 ppm benzene limit," Plaintiff's alleged injury "remains based on too attenuated a possibility that the sunscreen Plaintiff purchased may have contained an unsafe amount of benzene." 1-ER-007–008. The court also applied those conclusions to the SPF 30 Product, which neither Plaintiff nor Valisure tested. *Id*.

In analyzing Plaintiff's purchase of the SPF 50 Product, the district court undertook a detailed review of the FDA guidance on acceptable levels of benzene in drug products. 1-ER-008–010. The court held that "the FDA's 2 ppm benzene limit applies to Defendants" and that "the FDA's use of 'unacceptable levels of

benzene,' 'allowable limits,' and 'at or above 2 ppm' belie the existence of Plaintiff's suggested zero standard." 1-ER-010. The court then followed the case law that holds that plaintiff cannot state a claim of economic injury based on allegations that a product may be harmful because it contains a concentration of a substance the FDA has found to be acceptable. 1-ER-010–017. Based on those authorities, the court concluded that Plaintiff had not sufficiently alleged an economic injury because "Plaintiff's alleged loss in value also rests on a hypothetical risk that a product containing 0.29 ppm of benzene, an amount within the FDA guidelines, is unsafe." 1-ER-015.

At the hearing on the Motion to Dismiss the Second Amended Complaint, "Plaintiff acknowledged that allowing another amendment would not be helpful." 1-ER-018. The district court, therefore, dismissed the action without leave to amend. *Id.*

## SUMMARY OF ARGUMENT

The district court properly held that Plaintiff does not have Article III standing to pursue claims for damages or injunctive relief, with respect to any of the three Products she allegedly purchased. The FDA has determined that benzene levels of 2 ppm are acceptable in drug products. Plaintiff does not allege – and has no basis to allege – that any sample of any of the Products contains benzene levels that approach the threshold the FDA has set. Plaintiff's claims, therefore, are based

on her own "unusual or absurd" personal belief that benzene concentrations well below 2 ppm may present a risk of future harm. Such a subjective belief is too remote and speculative to provide a basis for economic injury in fact. Courts, therefore, consistently hold that a consumer who purchases a product that allegedly contains concentrations of a substance that the FDA has deemed to be acceptable, and who alleges no physical injury, has no standing to proceed in federal court.

The district court correctly held that Plaintiff does not have Article III standing to pursue claims for damages or injunctive relief, with respect to the SPF 100 Product and the SPF 30 Product, for the additional reason that Plaintiff has not plausibly alleged that either contained any level of benzene. Plaintiff does not allege that the SPF 30 Product she purchased was tested for benzene by anyone. She alleges that Valisure tested a sample of a product that has the same SPF protection as the SPF 100 Product. She does not allege, however, that the SPF 100 Product she purchased was from the same batch that Valisure tested. She does not allege that Valisure ran that test close to the time that she purchased the SPF 100 Product. She does not allege that Defendants systematically or routinely added benzene to any of the Products. She does not allege any facts that would connect the SPF 100 product that Valisure tested to the SPF 100 Product she purchased. Even the presence of acceptable levels of benzene in the SPF 30 Product and the SPF 100 Product, therefore, is conjectural and hypothetical.

Valisure's tests show that none of Defendants' sunscreen products contain benzene at levels at or above the threshold set by the FDA. The district court's decision that Plaintiff lacks standing, therefore, applied to her effort to prosecute claims based on products she did not purchase. Those claims are subject to dismissal for two additional reasons. First, Plaintiff cannot plausibly allege injury in fact that is concrete, particularized, actual, or imminent based on products she did not purchase. Second, even if the Court were to accept an exception under which a plaintiff may base claims on substantially similar products she did not purchase, the exception would not apply here. Had Plaintiff sustained any injury from the one Product she purchased that allegedly contained benzene, those she seeks to represent cannot be assumed to have sustained the same injury.

The Court, therefore, should affirm the district court's ruling dismissing this action without leave to amend.

## STANDARD OF REVIEW

The Court reviews *de novo* a decision by the district court to dismiss an action for lack of Article III standing under Fed. R. Civ. P. 12(b)(1). *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021).

# ARGUMENT

## I.   PLAINTIFF LACKS STANDING.

Under Article III of the United States Constitution, the jurisdiction of federal courts extends only to actual cases or controversies. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590, (1992). A complaint is subject to dismissal when plaintiff does not plausibly allege an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Plaintiff "must demonstrate that he has suffered an injury-in-fact, that the injury is traceable to [defendant's] actions, and that the injury can be redressed by a favorable decision." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011). A "plaintiff must demonstrate standing separately for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Environ. Svcs (TOC), Inc.*, 528 U.S. 167, 185 (2000).[2]

In *Lujan*, after setting forth the long-standing requirement that an "injury in fact" requires "an invasion of a legally protected interest which is (a) concrete and

---

[2] Because the district court held that Plaintiff had not sufficiently alleged standing to pursue any claims, it did not address the issue of whether Plaintiff had separately pleaded standing to redress prospective future injuries. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (where a complaint makes allegations of potential future injury, to support claims for injunctive relief, the threat of future harm must be "certainly impending," as opposed to a mere possibility). Defendants, therefore, have not briefed the issue here. Defendants will raise it, if necessary, at the proper time.

particularized," the court dropped a footnote, which states: "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." 504 U.S. at 560 n.1. Plaintiff seeks to use that language here to support the argument that she may base standing on her subjective belief that trace levels of benzene render a product unsafe – even if the FDA has determined that those levels are acceptable and her subjective belief is therefore "unusual or absurd." Opening Br. at 1.

Plaintiff's argument ignores the language of the *Lujan* decision to which the footnote applies and would take out of the Court's standing criteria the requirement to allege the invasion of a legally protected interest. In its place, Plaintiff's argument would substitute a requirement that plaintiff suffer the invasion of any interest she deems important. To accept that argument would open the doors of the federal courts to any claimant who has purchased a product that the FDA has deemed to be safe but that the claimant "says may be harmful." Opening Br. at 2. This would effectively eliminate the requirement of Article III standing in consumer fraud cases.

Courts continue to enforce the injury-in-fact requirement when they hold that, where plaintiffs allege they purchased and consumed a product, but that the levels of a potentially dangerous substance in the product "are unacceptable to her" or "were unsatisfactory to him," they do not have standing. *Koronthaly v. L'Oreal*

*USA, Inc.*, 374 F. App'x. 257, 259 (3d Cir. 2010); *Boysen v. Walgreen Co.*, No. 3:11-cv-06262-SI, 2012 WL 2953069, at \*7 (N.D. Cal. July 19, 2012). Here, because Plaintiff failed to plausibly allege an injury in fact, the SAC does not adequately plead standing under Article III.

## II. PLAINTIFF'S SUBJECTIVE BELIEF THAT THE PRODUCTS CONTAIN UNACCEPTABLE LEVELS OF BENZENE IS CONTRADICTED BY FDA GUIDANCE.

Though Plaintiff opens with the assertion that "unusual or even absurd" decisions are protected, she quickly pivots to the argument that she has plausibly alleged an economic injury because "the FDA does not permit benzene to be used in the manufacture of sunscreen products because of its unacceptable toxicity." Opening Br. at 7.

The FDA, however, has very carefully delineated the levels of benzene that are acceptable – and those that are not – in drug products. Plaintiff has not alleged that any of the products she purchased contain unacceptable levels of benzene.

### A. The FDA has Determined that Drug Products with Benzene Levels of Less than Two Parts Per Million Are Acceptable.

The FDA, in conjunction with the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (the "ICH"), has closely examined the potential effects of benzene on human health. As a result, the FDA, on three separate occasions, has issued industry guidance on what levels of

benzene are acceptable in drugs. Each has confirmed that levels of less than 2 ppm are acceptable.

In 2009, the FDA issued Guidance for Industry on Residual Solvents in Drug Products Marketed in the United States.[3] The 2009 Issuance incorporates *Impurities: Guidelines for Residual Solvents Q3c (R8)*,[4] published by the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use. 2009 Issuance at 1.

The ICH Q3C Standards begin: "The objective of this guideline is to recommend *acceptable amounts* for residual solvents in pharmaceuticals *for the safety of the patient*." ICH Q3C Standards at 1 (emphasis supplied). They state further: "Drug products should contain no higher levels of residual solvents than can be supported by safety data." *Id*. For benzene, the safety data supports levels of 2 ppm and lower. *Id*. at 5.

---

[3] *Residual Solvents in Drug Products Marketed in the United States*, FDA, Nov. 2009, available at: https://www.fda.gov/media/70928/download (last accessed July 13, 2023) (the "2009 Issuance").

[4] *Impurities: Guideline for Residual Solvents Q3C(R8)*, International counsel for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use, 2021, available at: https://database.ich.org/sites/default/files/ICH_Q3C-R8_Guideline_Step4_2021_0422_1.pdf (last accessed July 13, 2023) ("ICH Q3C Standards").

On December 23, 2021, the FDA issued additional guidance.[5] Its fundamental purpose was to remind drug manufacturers that they "are required to ensure the safety and quality of their drugs." 2021 Issuance. To that end, the FDA notified manufacturers that they "should not release any drug product batch that contains benzene above 2 ppm." *Id*. That notification was "consistent with the recommendations described in the ICH Q3C guidance." *Id*.

For "drug product batches with benzene above 2 ppm [that] are already in distribution," manufacturers were directed to contact the FDA to discuss a recall. *Id*. The FDA also announced "a stepwise approach" under which it would first identify those "products that should be immediately recalled or not released for distribution based on a benzene level in the products above 2 ppm." *Id*. This first step was again "consistent with the considerations described in ICH guidance." *Id*. The FDA then reminded manufacturers "of their obligation to submit a Field Alert Report (FAR) if testing reveals their drug products contain benzene above 2 ppm (21 CFR 314.81(b)(1)(ii))." 2021 Issuance. The 2021 Issuance linked to additional

_____

[5] *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs,* FDA, Dec. 23, 2022, available at: https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last accessed July 13, 2023) (the "2021 Issuance").

guidance on the purpose of an FAR.[6] The additional guidance emphasized the role of the FAR process in helping the FDA fulfill its responsibility to protect public health. *Id*.

On June 9, 2022, the FDA issued further guidance on acceptable and unacceptable levels of benzene in drug products.[7] It posed the question: "What should consumers know about drugs being recalled for benzene contamination?" and answered: "Consumers should stop using products that have been … tested by FDA and found to contain unacceptable levels of benzene." 2022 Issuance. Confirming that the line between acceptable and unacceptable levels was 2 ppm, the FDA again informed drug manufacturers that they "should not release any drug product batch that contains benzene above 2 ppm, consistent with the recommendations described in ICH Q3C." *Id*. Emphasizing that, in drawing this line, the FDA was fulfilling its obligation to protect public health, the guidance stated the "FDA is committed to ensuring drugs Americans use are safe and effective" and provided assurance that "we will continue to work with drug manufacturers to ensure the availability of safe and effective drugs for the

---

[6] *Field Alert Report Submission Questions and Answers Guidance for Industry*, FDA, July 2021, available at: https://www.fda.gov/media/114549/download (last accessed July 13, 2023).

[7] *Frequently Asked Questions on Benzene Contamination in Drugs*, FDA, June 9, 2022, available at: https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs (last accessed July 13, 2023) (the "2022 Issuance").

American public." *Id*. Those continued efforts have not resulted in any modification of the 2 ppm acceptability determination.

The line that the FDA draws between acceptable and unacceptable benzene levels applies to all drugs, including drugs that are ingested orally. The Food Drug & Cosmetic Act defines the term "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C. § 321(g)(1)(B). Although the generally applicable standard for acceptable levels of benzene is 2 ppm: "[h]igher levels of residual solvents may be acceptable in certain cases such as short term (30 days or less) or topical application." ICH Q3C Standards at 2. While Plaintiff does not allege that any of the Products she purchased contained levels above the generally-accepted limit of 2ppm, that limit may be even higher for those Products, because sunscreen is applied topically.

Plaintiff does not dispute any of these facts. Instead, she argues (1) that the 2009 Issuance means that no drug may contain any level of benzene and (2) that only the guidance on which she relies may be considered. Neither point is valid.

## B. The ICH Q3C Standards Do Not Prohibit Benzene in Sunscreen Products.

Plaintiff recognizes that "the levels of benzene detected in the sunscreens purchased by Ms. Bowen were less than the 2 ppm allowed by the FDA." Opening Br. at 9. She contradicts that fact, however, alleging that FDA guidance "provides

that there is no safe level of benzene." 3-ER-373 at ¶ 35. That allegation, is not only contradicted by Plaintiff's argument, it is not supported by the portion of the ICH Q3C Standards on which she relies.

In support, Plaintiff relies exclusively on this sentence from the ICH Q3C Standards: "Solvents in Class 1 should not be *employed* in the manufacture of drug substances, excipients, or drug products because of their unacceptable toxicity and their deleterious environmental effect." *Id*.; Opening Br. at 7 (emphasis supplied). *See* ICH Q3C Standards at 5. But the SAC does not allege that benzene is "employed" in the manufacture of the Products. *See* 3-ER-357–402.

"Employed" is the past participle of the verb "employ." "Employ" means "to use (something, such as time) advantageously."[8] When meant to connote "use" or "utilize," "employ" means "to put into service especially to attain an end" and "implies availing oneself of something as a means or instrument to an end." *Id*. Plaintiff does not allege that Defendants use benzene as a means to attain an end. She does not allege that benzene is an active ingredient in the Products. *See* 21 C.F.R. § 210.3(b)(7) ("Active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any

---

[8] *Employ, Merriam-Webster*, available at: https://www.merriam-webster.com/dictionary/employ (last accessed July 13, 2023).

function of the body of man or other animals."). She does not allege that benzene is an inactive ingredient in the Products. *See* 21 C.F.R. § 210.3(b)(8) ("Inactive ingredient" is any "component" that is not an active ingredient). She does not allege that benzene is a component in the Products. *See* 21 C.F.R. § 210.3(b)(3) ("Component" is "any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product"). Rather, Plaintiff argues that the "should not be employed" clause of the ICH Q3C Standards applies because she alleges that "Defendants knew or should have known that their Sunscreen Products contained benzene." Opening Br. at 27.

That conclusory allegation that Defendants knew or should have known that the Products contained benzene is accompanied by no allegations of fact. Nor does Plaintiff attempt to explain – in the SAC or in her Opening Brief – how a conclusion that Defendants knew or should have known that benzene of unspecified origin was contained in one of the Products supports the wholly separate argument that Defendants purposefully employed benzene in the Products. The allegation cannot plausibly be interpreted to mean that Defendants employ benzene as a means to attain an end or that benzene is an ingredient in the Product.

Not only does the SAC include no allegation that Defendants employ benzene in the Products, Plaintiff affirmatively alleges that some batches of the Products contain benzene and some do not. 3-ER-362 at ¶ 8; 3-ER-370 at ¶ 27; 3-

ER-374 at ¶ 37; *see also Bodle v. Johnson & Johnson Consumer Inc.*, No. 3:21-cv-07742-EMC, 2022 WL 18495043, at *1 (N.D. Cal., Feb. 24, 2022) (the Valisure tests on which Plaintiff relies here showed that "there is *significant batch-to-batch variation* in benzene content, but *many batches of sunscreen contain no detectable benzene*") (emphasis by the court). This "variability" could not result from the employment of benzene as a means to achieve an end.

Because Plaintiff does not allege that Defendants intentionally add or otherwise "employ" benzene in the manufacture of sunscreen products, the "should not be employed" clause of the ICH Q3C Standards does not apply. Instead, the pertinent portions of FDA guidance establish that the data supports benzene concentration limits of 2 ppm and that the FDA has determined, in the course of fulfilling its obligation to ensure the availability of safe and effective drugs for the American public, that the distribution of drugs that contain benzene levels of less than 2 ppm present no threat to the public health. *See* 2009 Issuance; 2021 Issuance; 2022 Issuance.

## III.   COURTS FOLLOW FDA DETERMINATIONS.

*Moore v. Trader Joe's*, 4 F.4th 874 (9th Cir. 2021) demonstrates that the district court was correct to follow FDA guidance. *Moore* involved a product that defendant marketed as "100% New Zealand Manuka Honey" or "New Zealand Manuka Honey." *Id*. at 876. The ingredient statement for all jars of the product

lists Manuka honey as the sole ingredient. *Id*. at 878. In fact, the product is not honey derived 100% from the nectar of the Manuka flower. *Id*. at 881. In dismissing for failure to state a claim, the district court "based much of its decision on the FDA's Honey Guidelines." *Id*.

The Ninth Circuit affirmed, holding that defendant's statements would not mislead a reasonable consumer because, "by the FDA's own definition, Manuka honey is a honey whose 'chief floral source' is the Manuka flower." *Id*. The court concluded further that, because – under the FDA guidance – "Manuka honey" is the "common or usual name" for honey whose chief floral source is the Manuka bush, the ingredient statement also was accurate. *Id*. at 885.

**A.      Because the FDA has Determined the Benzene Level the Products Allegedly Contain Is Acceptable, Plaintiff Cannot State a Cognizable Claim of Economic Injury.**

*Moore* establishes the point that FDA guidance matters. *See also Martinez v. Mead Johnson & Co.,* LLC, No. 5:22-cv-00213, 2022 WL 15053334, at *6 (C.D. Cal. Oct. 22, 2022), *app. dismissed*, No. 23-55141 (9th Cir. 2023) (a reasonable person would not believe it to be deceptive to call powdered baby formula products "milk-based," when milk is not the primary ingredient, because "FDA guidance suggests that labels should identify or describe 'the basic nature of the food or its characterizing properties or ingredients.'"); *Andrade-Heymsfield v. Danone US, Inc.*, No. 3:19-cv-589, 2019 WL 3817948, at *8 (S.D. Cal. Aug. 14, 2019), *app.*

22

*dismissed*, No. 19-56082, 2020 WL 5513552 (9th Cir. 2020) (court considered FDA warning letters and an "FDA guidance document" and held that "Plaintiffs cannot claim deception on label statements modeled on FDA guidance.") The point is brought more closely to bear here by decisions that consistently reject claims that products are unsafe when the FDA has provided contrary guidance.

Courts "universally reject general causation theories based upon the idea that *any* amount of a carcinogen, no matter how small, is actionable." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, --- F. Supp. 3d ---, No. 20-MD-2924, 2022 WL 17480906, at *17 (S.D. Fla. Dec. 6, 2022) (emphasis by the court). Rather, an applicable "threshold" amount or range must be identified. *Id*.; *see also Seaman v. Seacor Marine, LLC*, 326 F. App'x. 721, 726 (5th Cir. 2009) (expert's opinion excluded because she provided "no clue regarding what would be a harmful level of Ferox exposure"). Where the FDA has set the threshold, courts adhere to it.

In *Koronthaly*, plaintiff complained that the lipstick she purchased contained unsafe levels of lead. 374 F. App'x. at 258. The Third Circuit held that plaintiff's "argument that she was misled into purchasing unsafe lipstick products is belied by the FDA's report finding that the lead levels in the Defendants' lipsticks were not dangerous and therefore did not require warnings." *Id*. at 259. Plaintiff, therefore, had "asserted only a subjective allegation that the trace

amounts of lead in the lipsticks are unacceptable to her, not an injury-in-fact sufficient to confer Article III standing." *Id*.

*Huertas v. Bayer*, No. 2:21-cv-20021, 2022 WL 3572818 (D.N.J. Aug. 19, 2022) involved benzene in antifungal spray products. Plaintiffs alleged that "any significant detection of benzene in such products is unacceptable." *Id*. at *1. The court dismissed for lack of Article III standing. *Id*. at *7. The court pointed out that "Plaintiffs' Complaint does not discuss the actual FDA guidelines or note the specific, acceptable amount of benzene in the given type of product." *Id*. at *6. It held that the "allegation that 'the Products expose consumers to benzene well above the legal limit' is conclusory in that it does not elucidate the actual FDA guideline on the allowable limit, and further fails to compare the allowable amount with the amount that actually existed in the Products." *Id*. Plaintiffs' quotation of "a scholarly journal article suggesting that 'there is *probably* no safe level of exposure to benzene,'" did "not demarcate the requirements that the FDA sets forth concerning levels of carcinogenic contaminants and amounts to probability and speculation." *Id*. (emphasis by the court).

*Boysen* arose out of allegations that fruit juice plaintiff purchased contained harmful levels of lead and arsenic. 2012 WL 2953069 at *1. In holding that plaintiff did not have Article III standing, the court analyzed FDA publications on acceptable levels of heavy metals in juice. *Id*. at *5-6. The court pointed out that,

24

"[w]hile the FDA has issued no formal regulations, it has provided guidance to fruit juice processors." *Id*. at \*5. That guidance indicated that "lead quantities should not exceed 50 ppb" and that products "containing over 23 ppb of inorganic arsenic would represent a potential health risk." *Id*. Because all levels of arsenic and lead that plaintiff alleged were below the FDA's guidance levels, those allegations were "not sufficient to establish Article III injury in fact." *Id*. at \*7.

In *Herrington v. Johnson & Johnson Consumer Cos., Inc.*, plaintiffs alleged that defendants sold bath products for children that contain carcinogens. No. 4:09-cv-1597-CW, 2010 WL 3448531, at\*1 (N.D. Cal. Sept. 1, 2010). They alleged that "there is no safe level of exposure to a carcinogen." *Id*. at \*3. The court noted that the FDA had reported that carcinogens of which plaintiffs complained, at the "levels we have seen in our monitoring of cosmetics[,] do not present a hazard to consumers." *Id*. at n.2. The court therefore followed *Koronthaly* in holding that "the risk Plaintiffs plead is too attenuated and not sufficiently imminent to confer Article III standing." *Id*. at \*3. [9]

---

[9] *See also Cristia v. Trader Joe's Co.*, No. 1:22-cv-1788, 2022 WL 17551552, at \*5 (N.D. Ill. Dec. 9, 2022) (dismissing complaint where "plaintiff's interpretation is contrary to the FDA's guidelines for juice manufacturing, as explained in the judicially noticed and publicly available PSA"); *In re Fruit Juice Products Marketing Sales and Practices Litig.*, 831 F. Supp. 2d 507, 511 (D. Mass. 2011) (plaintiffs had no standing where the "products have not been recalled and the FDA has found that at least some of these products do not pose an unacceptable risk to human health.")

Plaintiff seeks to distinguish *Boysen* and *Herrington*, arguing that "plaintiffs in those cases did not allege economic harm in reliance on false labeling and advertising under California's Unfair Competition Law." Opening Br. at 18. In *Boysen*, plaintiff alleged "violations under [California's] Unfair Competition Law, 'Unfair, Unlawful and Deceptive Business Practices,' and … 'False or Misleading Advertising'" and that "by purchasing the juices he suffered economic injury." 2012 WL 2953069 at *2. The *Herrington* plaintiffs' allegations included violations of California's false advertising statute, California's Unfair Competition Law, and California's Consumer Legal Remedies Act and "economic harm resulting from the purchase of these contaminated, defective bath products." 2010 WL 3448531 at *1, 2.

Thus, the difference between *Boysen* and *Herrington*, on one hand, and *Degelmann v. Advanced Medical Optics, Inc.*, 659 F.3d 835 (9th Cir. 2011), *vacated* 699 F.3d 1103 (9th Cir. 2012), on the other, is not in the causes of action or the type of injury plaintiffs alleged. The distinction is in the substance of the applicable FDA guidance. In *Boysen* and *Herrington* the guidance indicated that the levels of the allegedly harmful substance of which plaintiff complained were acceptable, demonstrating that the risk of which plaintiffs complained was too attenuated to confer Article III standing. In *Degelmann*, the FDA and the Centers for Disease Control and Prevention "reported an increase of a serious eye

infection" associated with use of defendant's product. 659 F.3d at 838. Plaintiffs, therefore, were able to plausibly allege that they were deceived into purchasing a product that did not disinfect as well as it represented.

Here, the FDA has determined that drug products containing benzene levels of less than 2 ppm are acceptable, may be distributed, and do not require discussing recall. The FDA has not found any increase in infection, disease, or other health problem associated with Defendants' products.

**B.    The District Court Properly took Judicial Notice of the 2021 and 2022 Issuances.**

Plaintiff argues that the district court was not permitted to rely on the 2021 Issuance or the 2022 Issuance because "they represent the FDA's 'current thinking' on a topic," the "FDA is free to abandon its 'current thinking' on the question of the allowable benzene limit in drug products," and the 2021 Issuance and the 2022 Issuance, therefore, are neither final nor binding. Opening Br. at 26. That argument directly contradicts Plaintiff's reliance on the 2009 Issuance. It is also neither final nor binding.

The 2009 Issuance begins:

> This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.

27

2009 Issuance at 1. Courts, however, regularly take judicial notice of, and rely on, non-binding issuances by the FDA. *See* Fed. R. Evid. 201(b) (a court "may judicially notice a fact that is not subject to reasonable dispute because it: … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). The FDA, moreover, may issue guidance "in a variety of formats and names, including interpretive memoranda, policy statements, guidances, manuals, circulars, memoranda, bulletins, advisories, and the like." Final Bulletin for Agency Good Guidance Practices, 72 FR 3434 (Jan. 25, 2007).

In *Moore*, the FDA Honey Guidelines on which the district court "based much of its decision," were not binding and the Ninth Circuit affirmed. 4 F.4th at 881.

Courts within the Ninth Circuit consistently follow the Court of Appeals' lead in applying non-binding FDA guidance. *See Henning v. Luxury Brand Partners, LLC*, No. 3:22-cv-7011-TLT, 2023 WL 3555998 at *2 (N.D. Cal. May 11, 2023) (court took judicial notice of FDA publications, including the 2022 Issuance, because it was available on a "publicly accessible government website"); *Martinez*, 2022 WL 15053334 at *4 (FDA guidance "*is* a judicially noticeable document, as it is publicly available and it was disseminated by a government agency.") (emphasis by the court); *Andrade-Heymsfield*, 2019 WL 3817948 at *2 (district court took judicial notice of "five FDA warning letters and an FDA

28

guidance document" because: "[a]t the motion to dismiss stage a court may consider materials incorporated into the complaint or matters of public record without converting the motion to dismiss into a motion for summary judgment."); *Boysen*, 2012 WL 2953069 at *1 n.2 (court took judicial notice of multiple non-binding FDA publications because: "[i]n considering a motion to dismiss, the court may take judicial notice of matters of public record outside the pleadings."); *see also Cristia*, 2022 WL 17551552 at *3 ("courts routinely take judicial notice of the information on official government websites," such as public service announcements by the FDA) (quoting *Denius v. Dunlap*, 330 F.3d 919, 926–27 (7th Cir. 2003)).

Plaintiff, in support of her argument that the district court should not have relied on the 2021 Issuance and the 2022 Issuance, cites no case in which a court has held that FDA guidance should not be considered in determining the plausibility of consumer fraud claims – or that otherwise contradicts *Moore*. Instead she cites cases that consider the application of *Chevron*[10] deference to an agency's interpretation of an ambiguous statute. Opening Br. at 25.

---

[10] *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-44 (1984) held that "a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Christensen v. Harris Cty.*, 529 U.S. 576, 587-88 (2000).

Here, the district court did not refer to FDA guidance for the purpose of construing an ambiguous statute. Rather, the 2009 Issuance – like the 2021 Issuance and the 2022 Issuance – is relevant because courts consistently hold that a plaintiff cannot make a cognizable claim of economic injury where she has purchased a product that the FDA has determined contains acceptable levels of a substance that allegedly presents a risk of harm. Defendants, moreover, have not argued that either the district court or this court must defer to any interpretation by the FDA of its guidance. On the contrary, Defendants assert that the district court properly exercised its independent judgment in interpreting each FDA Issuance.

## C.     The District Court Properly Interpreted the FDA Issuances.

Plaintiff argues that it was improper for the district court to interpret the 2021 Issuance and 2022 Issuance and that, in doing so, it "decide[d] contested issues of material fact." Opening Br. at 24. Plaintiff does not argue that the district court should not have interpreted the 2009 Issuance. Plaintiff contends that the distinction should be made because the two later Issuances "are not 'final agency' actions." *Id*. The 2009 Issuance, on which Plaintiff relies, is also not a final agency action. 2009 Issuance at 1. Fed. R. Evid. 201(b), however, is designed to permit consideration of noticeable materials at the pleadings stage. *Scruggs v. Mars, Inc.*, No. 2:22-cv-5617, 2023 WL 3668706 at *2 (C.D. Cal. May 22, 2023) ("Consideration of such materials ensures that 'allegations that contradict

matters properly subject to judicial notice or by exhibit' are not simply 'accepted as true' in connection with a motion to dismiss.") (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). Courts, therefore, regularly interpret FDA non-binding guidance at the motion to dismiss stage.

*Moore* came to the Ninth Circuit on appeal from an order granting defendant's motion to dismiss under Rule 12(b)(6). 4 F.4th at 880. The non-binding FDA guidance at the heart of the case said that honey may be identified by its "chief floral source." *Id*. at 881. Plaintiffs' tests "revealed that only between 57.3% and 62.6% of the honey came from Manuka flower nectar." *Id*. at 880. That left for interpretation whether an average Manuka concentration of 59.95% made Manuka the chief floral source of Trader Joe's honey. Under Plaintiff's argument here, that would be for a jury to decide, as a matter of fact. Under the Ninth Circuit's decision in *Moore*, it is for the court to decide, as a matter of law. The *Moore* court therefore considered the honey producers' system for grading the purity of honey, on which Trader Joe's honey scored "a relatively low grade," *id*. at 877-88; parsed the FDA's guidelines, *id*. at 881; consulted the *Merriam-Webster.com Dictionary*, *id*. at n.8; and held:

> While the FDA does not specifically define "chief floral source," *we interpret it* to mean that the principal source of the honey is a single floral source.

31

*Id*. at 881 (emphasis supplied). In dismissing the action, therefore, the district court correctly held that "all of the honey involved is technically manuka honey." *Id*.

In *Boysen*, the court noted that, while it was taking judicial notice of non-binding FDA guidance on acceptable levels of heavy metals in fruit juice, "the Court does not rely on or take as fact defendant's interpretation of these Exhibits." 2012 WL 2953069 at *1 n.2. The court then carefully parsed the FDA guidance and independently interpreted it to mean that the levels of arsenic and lead plaintiff alleged were acceptable. *Id*. at *5-6. Therefore, plaintiff had not sufficiently alleged economic injury and the court dismissed the complaint. *Id*. at *7.

In *Huertas*, the court also granted a motion to dismiss under Rule 12(b)(1). 2022 WL 3572818 at *1. The court was required to interpret the FDA guidance in order to determine the "acceptable amount of benzene in the given type of product," to "elucidate the actual FDA guideline on the allowable limit," to "demarcate the requirements that the FDA sets forth," and to compare the FDA guidelines to plaintiffs' allegations. *Id*. at *6.

Plaintiff cites *BBK Tobacco & Foods, LLP v. U.S. Food & Drug Admin.*, 672 F. Supp. 2d 969 (D. Ariz. 2009) in support of her argument that interpretation of regulatory guidelines requires a court to resolve questions of fact. *BBK* turned on the issue of ripeness and is inapt.

32

The Family Smoking Prevention and Tobacco Control Act prohibits the use of flavoring in tobacco products. 21 U.S.C. § 387g(a)(1)(A). The FDA issued a Q&A guidance document that indicated that the law prohibits flavoring in roll-your-own cigarette papers. *BBK Tobacco*, 672 F. Supp. 2d at 972. Plaintiff sought a declaratory judgment that roll-your-own cigarette papers are not tobacco products and that FSPTC Act did not authorize the FDA to regulate non-tobacco products. *Id*. at 973. The FDA had not issued a warning letter or taken any enforcement actions against BBK or any other company that produced flavored rolling papers. *Id*. at 974. The court held that the Q&A "statements fail as final agency action within the meaning of the ripeness inquiry." *Id*. at 975. The court was not presented with and did not consider the issue of whether a judge or a jury should interpret FDA guidance in a consumer deception case – or in any other action where plaintiff is not seeking "an advisory opinion" or requesting the court to engage "in the business of resolving *if-then* hypotheticals." *Id*.

Here, none of the parties has sought a declaration as to the FDA's authority to issue guidance on the level of benzene that is acceptable in drug products. Instead, all parties contend that it was appropriate for the district court to interpret the 2009 Issuance – and Defendants contend that it was appropriate for the district court to interpret all three FDA Issuances. *Moore* and each other pertinent case the

parties have cited establish that such interpretations are properly made by courts – not by juries.

**D.    The Cases on which Plaintiff Relies Do Not Carry her Argument that Interpretation of FDA Guidance Is for a Jury.**

In support of the argument that "whether the FDA's alleged 2 ppm benzene standard is preclusive and/or what amount of benzene leads to harm are hotly contested issues of fact that go to the merits of Plaintiff's claims," Plaintiff cites *Henning*, 2023 WL 3555998; *Clinger v. Edgewell Personal Care Brands, LLC*, No. 3:21-cv-1040, 2023 WL 2477499 (D. Conn. March 13, 2023), and *Gagetta v. Walmart, Inc.*, --- F. Supp. 3d ---, No. 3:22-cv-3757, 2022 WL 17812924 (N.D. Cal. Dec. 19, 2022).  Opening Br. at 28. To the extent that those cases hold that plaintiff has sufficiently alleged economic injury when she complains of substance levels that comply with FDA guidance, they contradict *Moore*. There are, moreover, additional reasons why the decisions reached there should not apply here.

In *Henning*, the court held that "determination of an allowable benzene level is central to Plaintiff's claims." 2023 WL 3555998 at *9. Therefore, "Plaintiff's claims will be significantly affected regardless of whether the FDA sets a minimum allowable amount of benzene above or below that found in the Products." *Id*. at *8. The product at issue, however, was dry shampoo. *Id*. at *1. Dry shampoo is not a regulated drug. *See* 21 U.S.C. § 321(g)(1)(B). Defendant

34

argued that, for non-drug products, "neither zero nor 2 ppm of benzene are the threshold for cognizable injury" and pointed "to the lack of FDA regulation" of benzene in dry shampoo cosmetics and to "the benzene exposure levels set in other statutes." 2023 WL 3555998 at *3. On that basis, the court concluded that "the actual amount of benzene that leads to harm is a factual matter that is inappropriate for resolution at this stage." *Id.* Confirming its conclusion that drug guidance does not apply to dry shampoo, the court stated: "whether the amount of benzene in the [dry shampoo] Products is sufficient to render them adulterated or misbranded" had not been resolved by the FDA. *Id.* *8.

The FDA has determined the amount of allowable benzene in drug products. Plaintiff does not allege that any of the Products exceeds that amount. The central issue in this case, therefore, has been decided in a manner that confirms the district court's conclusion that Plaintiff lacks Article III standing.

*Clinger* involved benzene in sunscreen. 2023 WL 2477499 at *1. The FDA's guidance on drugs therefore applied and the court accepted that the FDA had made the "determination of what is a safe level for benzene" in sunscreen products. *Id.* at *5. The court, however, concluded that whether that "standard is preclusive is a merits question, not a standing question." *Id.* That is both the wrong question and the wrong answer here.

In the Ninth Circuit, the right question is not whether FDA guidance is preclusive, but whether a consumer can plausibly allege injury in fact based on her belief that a product contains levels of a substance the FDA has determined to be acceptable. In courts across the country – as shown above – the right answer is: where a product complies with specific FDA guidance, plaintiff does not plausibly allege economic injury by claiming that she would have paid less had she known that the product did not meet her own personal, "unusual or even absurd" standard. The district court here, therefore, did not engage "in a highly fact-specific evaluation of the safety risks posed by benzene," as the *Clinger* court erroneously concluded. *See id.* at *5. The FDA has made that evaluation. The *Clinger* holding that a jury should be permitted to re-evaluate the FDA's determination contradicts *Moore* and cases like it that hold that FDA guidance matters. *See* 4 F.4th at 881, 885.

Further, in rejecting defendants' preemption argument, the *Clinger* court stated that it could not determine whether the FDA's "should not be employed" guidance, on which Plaintiff relies here, applied, because there is "a factual dispute as to whether benzene is a purposefully used ingredient" in the sunscreen products at issue in *Clinger*. 2023 WL 2477499 at *11. Here, Plaintiff has not alleged that Defendants purposefully use – or employ – benzene in the manufacture of the Products. The SAC, therefore does not raise a factual issue on that subject.

36

Finally, in *Gagetta*, the FDA publications on which defendant relied "show only that the FDA monitors foods and that these metals are unsafe at particular levels; they do not definitively show that Walmart's products meet FDA guidelines." 2022 WL 17812924 at *5. The court therefore distinguished *Boysen*, where "the FDA issued reports stating that those levels of arsenic [that plaintiff alleged] in fruit juice were safe." *Id.*; *see Boysen*, 2012 WL 2953069 at *5-6.

Here, the FDA has determined that benzene at levels far below those alleged by Plaintiff are acceptable in drug products. It is *Boysen*, therefore – not *Gagetta* – that is apt.

## E.    Plaintiff Was Not Entitled to Discovery.

Plaintiff argues the district court "erred by denying Ms. Bowen the opportunity to conduct discovery where the issue of jurisdiction was intertwined with the merits of her claims." Opening Br. at 27. Plaintiff, however, made no request to be permitted to conduct discovery before the district court ruled on either of Defendants' motions to dismiss. Even had she been entitled to discovery, it would not provide a basis for reversal here. *Hayashi v. Red Wing Peat Corp.*, 396 F.2d 13, 14 (9th Cir. 1968) (dismissal for improper venue affirmed when the plaintiff "did not request an opportunity to conduct discovery on factual issues relating to the motion before the motion was determined").

Further, Plaintiff was not entitled to discovery for the purpose of searching for jurisdictional facts that she twice failed to allege. "The district court has wide discretion in controlling discovery." *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Denying jurisdictional discovery is not an abuse of discretion when a request is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (no abuse of discretion to deny request for jurisdictional discovery and affirming dismissal for lack of personal jurisdiction); *see also Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (no abuse of discretion to refuse jurisdictional discovery where plaintiffs only state "they 'believe' discovery will enable them to demonstrate sufficient California business contacts to establish the court's personal jurisdiction.").

The cases Plaintiff cites do not help her.

In *Vera v. Bureau of Indian Affairs*, the court held the motion to dismiss should have been treated as a motion for summary judgment and that "some discovery must be conducted before summary judgment can be granted." 738 F. App'x. 431, 432 (9th Cir. 2018). At issue in *Vera* was whether defendant controlled the portion of the road where plaintiff was injured. *Id*. The court found the issue of control to be "closely intertwined with the merits question of the government's duty to [plaintiff]" and because "discovery may yield information

38

relevant to critical matters at issue—specifically, the precise location of the accident and the portion of the road over with the United States had direct control—we are reluctant to grant summary judgment before the nonmoving party has had an opportunity for discovery." *Id*.

Unlike *Vera*, any discovery in this case would not "yield information relevant to critical matters at issue" because there are no factual issues entailed in applying the FDA's determination that 2 ppm of benzene in drug products is acceptable for health and safety.

In *Safe Air for Everyone v. Meyer*, the Ninth Circuit held it was error to dismiss under 12(b)(1) because the jurisdictional issue and substantive issue "are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits." 373 F.3d 1035, 1040 (9th Cir. 2004). The Ninth Circuit came to this conclusion because, whether plaintiff "alleged a claim that comes within [Resource Conservation and Recovery Act]'s reach goes to the merits of [plaintiff's] action," and the question of jurisdiction and merits of an action are intertwined "where a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Id*. at 1039-40 (internal citations omitted). Here, no statute provides the basis for both the court's subject matter jurisdiction and plaintiff's claim for relief.

Plaintiff failed to request discovery. Discovery, moreover, is not required to determine if Plaintiff has standing, because the question of jurisdiction and the merits of the action are not intertwined.

## IV. ALLEGING AN ATTENUATED RISK OF HARM DOES NOT STATE A CLAIM OF ECONOMIC INJURY.

Plaintiff alleges that, because some of the sunscreen products tested by Valisure contained benzene and some did not, there is a risk that any product contains benzene and therefore the purchase of sunscreen products requires consumers to play "Russian Roulette." 3-ER 374 at ¶ 37. The metaphor is wholly inapt. The FDA has concluded that the levels of benzene Plaintiff alleges are contained in some of the Products are acceptable; no agency, laboratory, or person has concluded that it is safe to put a partially-loaded gun to one's head and pull the trigger. Even if the metaphor had some applicability here, it would not advance Plaintiff's case.

Article III standing cannot be based on an allegation that a product may contain a substance that may be harmful, because economic injury cannot be premised on a hypothetical risk of harm. *Birdsong v. Apple, Inc*., 590 F.3d 955, 961 (9th Cir. 2009). Courts have applied that principle in dismissing cases involving alleged presence of benzene in sunscreen products.

In *Schloegel v. Edgewell Personal Care Co*., plaintiff alleged that some samples of Banana Boat® sunscreen products—including samples of the product

she purchased—had been found to contain benzene. No. 4:21-cv-00631-DGK, 2022 WL 808694, at *1 (W.D. Mo. Mar. 16, 2022). The court held that plaintiff did not have Article III standing and dismissed the complaint. *Id*. at *3. The court held: "[i]n the context of defective products, 'it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their* product *actually exhibited* the alleged defect.'" *Id*. at *2 (emphasis by the court) (quoting *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) and *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011)).

In *Bodle*, the court dismissed, under F. R. Civ. P. 12(b)(6), for failure to state a claim of injury where plaintiff alleged that she purchased sunscreen products "that *may* contain dangerous levels of benzene." 2022 WL 18495043 at *2 (emphasis by the court).

In *Schloegel* and *Bodle*, plaintiffs' claims failed in part because they did not allege that the specific products they purchased were tested and shown to contain benzene. The principle that standing may not be based on an alleged risk of injury applies with equal strength where plaintiff alleges that the products she purchased in fact contain a substance that *may* be harmful. As the *Wallace* court stated: "Accepting the consumers' various allegations," that some of defendant's products were not kosher, "it remains entirely possible, maybe probable, that the packages

41

of beef they personally purchased and consumed met the 'strict' standards advertised by [defendant]." 747 F.3d at 1030. *See also Kimca v. Sprouts Markets, Inc.*, No. 2:21-cv-12977, 2022 WL 1213488, at *8 (D.N.J. April 25, 2022) (without allegations establishing that "the levels of heavy metals in the Baby Food Products are unsafe … Plaintiffs' allegations are simply speculation."); *Blackburn v. Champions Petfoods USA, Inc.*, No. 1:18-cv-00038, 2021 WL 9682169 at *9 (S.D. Iowa Aug. 12, 2021) ("it is not enough for a plaintiff to allege … a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their* product *actually exhibited* the alleged defect.") (quoting *Wallace*, 747 F.3d at 1030 (8th Cir. 2014)); *Doss v. Gen. Mills, Inc.*, No. 0:18-cv-61924, 2019 WL 7946028, at *2 (S.D. Fla. June 14, 2019), *aff'd*, 816 F. App'x. 312 (11th Cir. 2020) (plaintiff had no standing where she alleged that the Cheerio's she purchased "contained or *could contain* glyphosate") (emphasis by the court); *Coffelt v. Kroger Co.*, No. 5:16-cv-1471, 2018 WL 6004543, at *11 (C.D. Cal. Aug. 17, 2018) ("Plaintiff offers no authority for the proposition that he has standing or injury simply because a product was recalled and *may* have been contaminated") (emphasis by the court); *Boysen*, 2012 WL 2953069 at *7 (plaintiff had no standing where complaint did not "expressly allege that the levels of lead and arsenic contained in defendant's juices are likely to cause physical harm."); *Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1120 (S.D. Ind. 2011) (plaintiffs'

suggestion "that they *may* experience future harm from their limited exposure to hexavalent chromium" does not come "close to establishing injury-in-fact") (emphasis by the court); *Herrington*, 2010 WL 3448531 at *3 (plaintiffs did "not plead facts to suggest that a palpable risk exists" because "[t]hey only allege that [the contaminants] *may* be carcinogenic for humans, that there *could* be no safe levels for exposure to carcinogens") (emphasis by the court).

In the face of this authority, Plaintiff cites *Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754 (9th Cir. 2004) in support of her argument that "threatened rather than actual injury can satisfy Article III standing requirements." Opening Br. at 20-21. In *Harris*, however, the court made clear that, to provide standing, plaintiff must plausibly allege "a concrete risk of harm." 366 F.3d at 761. A comparison of the imminence of the harm threatened there to that Plaintiff alleges here demonstrates why the risk Plaintiff alleges is not concrete.

In *Harris*, plaintiffs sought to enjoin the closure of two county hospitals, "LAC–USC" and "Rancho." *Id*. at 756-57. Plaintiffs were "indigent and uninsured county residents with serious health problems who regularly rely upon the county health care system for routine, rehabilitative, and emergency care." *Id*. at 758. They showed that they would immediately lose access to necessary healthcare if the facilities were closed. *Id*. at 759. Plaintiffs included a patient who "recently suffered a heart attack, waited ten days for a bed to become available at LAC–

USC, then waited three additional days for necessary surgery (which was interrupted and continued after a seven hour delay) and is now on five medications; … a former inpatient and current outpatient at Rancho who is paralyzed and confined to a wheelchair; … a former inpatient and current outpatient at Rancho who was confined to a wheelchair due to a spinal cord injury but learned to walk on crutches at Rancho; … a diabetic amputee who is a Rancho outpatient and former inpatient and who may still have an unhealed bone infection; [a patient] who waited ten months for necessary wrist surgery at LAC–USC and has been unable to alleviate his pain and swelling or to find work due to the delay; and [two patients], who each suffer from multiple medical conditions including liver problems, hypertension, hyperlipidemia, diabetes, breast cancer, arthritis, asthma, and partial blindness." *Id*. at 758.[11]

Here, by contrast, plaintiff alleges no present, imminent, or concrete threat to her health. Instead, she alleges that a Product she purchased contained benzene at a level the FDA has determined to be acceptable and that another Product she purchased may contain benzene, but also at a level well below the FDA safety

---

[11] *Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001), which Plaintiff cites, also involved "a credible threat to the plaintiff's physical well-being." *Id*. at 976. While plaintiffs did not adequately allege such a threat in *Hamman v. Cava Group, Inc.*, No. 3:22-cv-593, 2023 WL 3450654 (S.D. Cal. Feb. 8, 2023), the court concluded that they had. The decision, however, is distinguishable. There, the FDA had not determined an acceptable level for the PFAS that plaintiffs alleged "are dangerous even in small quantities." *Id*. at *5.

threshold. She has not stated, therefore, a cognizable claim of concrete economic injury.

## V. PLAINTIFF HAS NO STANDING WITH RESPECT TO PRODUCTS SHE DOES NOT ALLEGE CONTAINED BENZENE.

Plaintiff has no standing, with respect to each of the Products she purchased, based on the FDA's determination that drugs containing benzene levels below the levels she alleges in any of those Products are acceptable, may be distributed, and need not be the subject of a recall discussion. There are additional reasons why Plaintiff has no standing with respect to the SPF 30 Product, the SPF 100 Product, and Products Plaintiff does not specifically allege she purchased.

### A. Plaintiff has No Standing with Respect to Products in which No Benzene Has Been Detected.

Plaintiff does not allege that she or any other person tested the SPF 30 Product or a sample of any product in the SPF 30 Product line and found it to contain benzene. To support her contention that she has standing with respect to products that have not been found to contain benzene, Plaintiff argues that Ultra Sport 30 is "marketed in substantially the same way" as all Banana Boat sunscreen products—as 'sunscreen'—and that *all* such products contain the same defective labeling in that they do not disclose the presence of benzene as required under California law." Opening Br. at 22.

That argument is missing its fundamental predicate: an allegation that the SPF 30 Product or any product in the SPF 30 line has been found to contain benzene. The district court, therefore, in dismissing the First Amended Complaint, correctly held that:

> Taken to its logical extreme, Plaintiff's position would grant her standing to sue any manufacturer because there was some chance of a defect in the product she purchased, regardless of whether or not she actually purchased a product in the affected batch – Plaintiff could sue an automobile manufacturer after purchasing a car because another car made by the manufacturer had some putative defect, even if her car was demonstrably made at an entirely different factory at an entirely different time period.

3-ER-409. Such a claim fails the most basic standing test: the requirement that, to be concrete, the alleged injury must "actually exist." *Spokeo*, 578 U.S. at 340; *see Clinger*, 2023 WL 2477499 at *7 ("It would be speculative—rather than plausible—to conclude that benzene was present in Banana Boat product lines for which there are no positive test results for the presence of benzene.").

**B.    Plaintiff has No Standing with Respect to the SPF 100 Product.**

As Valisure admitted, its tests showed "significant variability from batch to batch, even within a single brand" and that "many batches of sunscreen contain no detectable benzene." 1-ER-208; 1-ER-215–216. Further, Valisure emphasized that benzene "has not been detected in all sunscreen products and that unadulterated sunscreen products are available and should continue to be utilized." 1-ER-217. Courts, therefore, have rejected attempts to base standing on alleged economic loss

arising out of the purchase of sunscreen in the line of products that Valisure tested.

The *Bodle* court rejected standing where plaintiff based her allegation of economic harm on Valisure testing, pointing out that Valisure stated that "this contamination has not been detected in all sunscreen products and that unadulterated products are available and should continue to be utilized." 2022 WL 18495043 at \*1. The court held that this variable test result "is insufficient to establish a plausible claim that [plaintiff] purchased a contaminated product." *Id*. at \*2. And in *Schloegel*, plaintiff alleged that "some samples of Banana Boat sunscreen products—including samples of the product she purchased—have been found to be adulterated with benzene." 2022 WL 808694 at \*1. The court dismissed for lack of standing, holding that plaintiff "has failed to allege that she actually purchased Banana Boat Sunscreen products which were adulterated with benzene." *Id*. at \*2.

Courts consistently apply the principles on which those decisions are based to claims in which plaintiffs seek to generalize the results of tests on products they did not purchase. *See Wallace*, 747 F.3d at 1030 (plaintiffs lacked standing because they "fail[ed] to show that any of the particular packages of [hotdogs] they personally purchased contained non-kosher beef"); *Huertas v. Bayer*, No. 2:21-cv-20021, 2023 WL 3773139, at \*10 (D.N.J. May 23, 2023) ("Tests performed on other batches of similar products cannot translate to the assumption that all of the

Products at issue here contained benzene, and/or contained excessive levels of such."); *Onaka v. Shiseido Americas Corp.*, No. 1:21-cv-10665, 2023 WL 2663877, at *2, 5 (S.D.N.Y. Mar. 28, 2023) (where plaintiffs "tested each type of the Products they purchased," but not the actual products, they had no standing because they "provide no facts from which the Court could extrapolate that their isolated testing should apply broadly to Defendant's Products, regardless of when they were purchased."); *Blackburn*, 2021 WL 9682169, *9 ("it is not enough for a plaintiff to allege that a product line contains a defect"); *Song v. Champion Petfoods, Inc., USA, Inc*., No. 0:18-cv-3205, 2020 WL 7624861, at *6 (D. Minn. Dec. 22, 2020) (where testing data shows that some bags contained BPA but "plaintiffs have not alleged that they personally purchased dog food that contained BPA," plaintiffs lacked standing); *Pels v. Keurig Dr. Pepper, Inc.*, No. 3:19-cv-03052, 2019 WL 5813422, at *4 (N.D. Cal. Nov. 7, 2019) (plaintiff lacked standing where he alleged that regulators found arsenic levels exceeding FDA limits in defendant's water but did not "plead the water *he* purchased contained violative arsenic levels.") (emphasis by the court); *Gaminde v. Lang Pharma Nutrition, Inc.*, No. 1:18-cv-300, 2019 WL 1338724, at *3-4 (N.D.N.Y. Mar. 25, 2019) (plaintiff lacked standing because of his "failure to allege that he tested his bottle of CVS Krill Oil"); *Doss*, 2019 WL 7946028 at *2 (plaintiff lacked standing because she did not "allege that the Cheerios she herself bought actually contain

48

any glyphosate — just that some Cheerios that have been tested do.").

In the face of this authority, Plaintiff relies on three district court cases to support her argument that it is not necessary for her to allege that the product she purchased contained benzene. Opening Br. at 16. None of the cases establishes the point.

In *Barnes v. Unilever United States, Inc.*, the court relied on allegations by each named plaintiff "that the products they purchased (or at least some of them) were adulterated with benzene." No. 1:21-cv-6191, 2022 WL 2915629, at *1 (N.D. Ill. July 24, 2022). Here, Plaintiff does not allege that any of the SPF 100 Product *she* purchased contained benzene.

The *Clinger* court mistakenly relied on *John v. Whole Foods Market Group, Inc.*, 858 F.3d 732 (2d Cir. 2017), in holding that plaintiffs were not required to allege that the products they purchased contained benzene. 2023 WL 2477499 at *4. *John*, however, was a slack-fill case. 858 F.3d at 734. Plaintiff alleged that he purchased defendant's pre-packaged products one to two time per month over a period of two years. *Id*. The studies on which plaintiff relied showed that defendant "systematically and routinely" filled the same over-sized package with the same under-sized products. *Id*. at 737. The Second Circuit therefore held that, "it is plausible that John overpaid for at least one product." *Id*.

Here, Plaintiff does not allege that she regularly purchased Products or that

49

any benzene was systematically or routinely added to the Products she purchased. Instead she alleges that "[b]etween 2017 and 2020" she purchased "numerous Sunscreen Products," and that some batches of those products contain benzene and some do not. 3-ER-360 at ¶ 5; 3-ER-362 at ¶ 8; 3-ER-370 at ¶ 27; 3-ER-374 at ¶ 37.

The *Clinger* court also relied on its conclusion that "it is reasonable to assume that benzene did not magically appear in Banana Boat products. It must have appeared by reason of some aspect of the manufacturing process." 2023 WL 2477499 at *4. Here, however, Plaintiff not only alleges that not all tested batches contained benzene, but the Valisure tests on which Plaintiff relies showed that "many batches of sunscreen contain no detectable benzene." 1-ER-215–216; *Bodle*, 2022 WL 18495043 at *1. It is not necessary, therefore, to assume that magic is responsible for variability between sunscreens and Plaintiff has not plausibly alleged that Plaintiff overpaid for at least one SPF 100 Product.

The *Clinger* court held that, "if the plaintiffs bought a particular sunscreen product reasonably near in time to the testing positive of that product for the presence of benzene, then it is at least plausible to conclude that the product purchased by the plaintiff was also contaminated with benzene." 2023 WL 2477499 at *4. Here, the unspecified number of Product-purchases Plaintiff allegedly made occurred at some unspecified time in 2017, 2018, 2019, or 2020. 3-

ER-360 at ¶ 5. She alleges that the Valisure tests on which she relies were done at an unspecified time in 2020. 3-ER-362 at ¶ 8. She does not allege the size of any Product batch, the volume of the Product's sales, or any other information that could provide the basis for any conclusion that any Product Plaintiff purchased shared all the same characteristics as the products Valisure tested.

In *Gagetta*, the test report on which plaintiffs relied found that "all of Walmart's tested products contained unsafe levels of heavy metals." 2022 WL 17812924 at *4. Walmart, moreover, did "not contest that its products probably contain heavy metals." *Id.*

Here, the Valisure test results indicate that some of Defendants' products contain benzene at levels below the FDA's acceptable threshold and that some contain no detectable benzene. 2-ER-213–215; 2-ER-221–228. Defendants, moreover, do not admit that any of its sunscreen products contain benzene. [12]

---

[12] In *Bojko v. Pierre Fabre USA, Inc.*, the court was not convinced economic injury exists "if based merely on the *risk* that the Products they purchased contained benzene." No. 1:22-cv-6728, 2023 WL 4204663, at *3 (N.D. Ill. June 27, 2023) (emphasis by the court). While the court ultimately found that when the allegations were construed in plaintiffs' favor, they "nudge[d]" their claim "across the line from conceivable to plausible," *id*. at *2, the allegations in *Bojko* are distinguished from this case. In *Bojko*, Valisure tested multiple sample of the same types of products plaintiffs purchased. *Id*. The majority of the products tested, moreover, contained benzene, with detected limits ranging from 0.2 ppm to 5.7 ppm. *Id*. Here, Valisure did not test products in the line of the SPF 30 Product or the SPF 50 Product and may have tested products in the line of the SPF 100 Product. None of Defendants' products tested positive for benzene at a level near 2 ppm.

**C.      Plaintiff has No Standing with Respect to Products she Did Not Purchase.**

Plaintiff seeks to represent a class consisting of: "[a]ll consumers who purchased any lotion or spray Banana Boat Sunscreen Product in the State of California from May 25, 2017 to the present for personal use or consumption." 3-ER-380 at ¶ 49. Plaintiff has no standing to prosecute claims on the basis of products she did not purchase. *Granfield v. NVIDIA Corp.,* No. 3:11-cv-5403, 2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012) ("when a plaintiff asserts claims based both on products that she purchased and products that she did not purchase, claims relating to products not purchased must be dismissed for lack of standing"); *Carrea v. Dreyer's Grand Ice Cream, Inc.,* No. 3:10-cv-1044, 2011 WL 159380, at *3 (N.D. Cal. Jan. 10, 2011), *aff'd on other grounds,* 475 F. App'x. 113 (9th Cir. 2012), *abrogated on other grounds*, *Hawkins v. Kroger Co.*, 906 F.3d 763, 771 n.7 (9th Cir. 2018) (all claims based on products plaintiff did not purchased dismissed for lack of standing).

Plaintiff, however, cites *LeGrand v. Abbott Lab'ys*, --- F. Supp. 3d ---, No. 3:22-cv-5815, 2023 WL 1819159 (N.D. Cal. Feb. 23, 2023) and *Miller v. Ghiradelli Chocolate Co.*, 912 F. Supp. 2d 861 (N. D. Cal. 2012) for the proposition that she has "standing to assert claims for products she did not purchase." Opening Br. at 22.

In *Miller*, the court held that plaintiffs did not have Article III standing to

pursue claims based on products they did not purchase. 912 F. Supp. 2d at 872.

The court, however, suggested that plaintiffs may have had standing, had the

products they did not purchase been substantially similar to the products they did

purchase. *Id*. The Ninth Circuit has not adopted that suggestion.

"The similarity of a product, by itself, says nothing about whether a party

suffered an injury traceable to the allegedly wrongful conduct of another."

*Lorentzen v. Kroger Co.*, 532 F. Supp. 3d 901, 909 (C.D. Cal. 2021). The similar-

product exception, therefore, ignores the concrete-injury requirement of Article III

standing:

> Article III "standing is not dispensed in gross." *Lewis v. Casey*, 518
> U.S. 343, 358 n.6 (1996); *see also Blum v. Yaretsky*, 457 U.S. 991,
> 999, (1982) ("Nor does a plaintiff who has been subject to injurious
> conduct of one kind possess by virtue of that injury the necessary
> stake in litigating conduct of another kind, although similar, to which
> he has not been subject."). Importing a "substantial similarity" test
> into the principle of standing overlooks this point and invites an
> analysis that is both difficult to apply and unrelated to its objective.

*Id*. at 909. Even were the Court to accept the similar-product exception to the

concrete-injury rule, moreover, it would not apply here.

The rationale of the exception suggested in *Miller* is that:

> a plaintiff is not suing over an injury she did not suffer. Rather, a
> plaintiff in that scenario is suing over an injury she personally
> suffered and asserting that others who purchased similar products
> suffered substantially the same injury.

*Bruton v. Gerber Prod. Co.*, No. 5:12-cv-02412, 2014 WL 172111, at *8 (N.D.

Cal. Jan. 15, 2014). A touchstone, therefore, is whether the products not purchased have the same deficiencies and cause the same injury as those that were purchased. The point is illustrated by *LeGrand*. There, the court in did not consider Article III standing. In ruling on injury in fact for statutory standing, however, the court relied on the fact that "[a]ll the relevant products contain added sugar in harmful amounts, the key ingredient underpinning LeGrand's false advertising claims." 2023 WL 1819159 at *6.

Here the key ingredient underpinning Plaintiff's claims is the alleged presence of benzene. Plaintiff alleges that some of Defendants' products contain benzene and some do not. Valisure found that those that contain benzene contain varying levels of benzene. Different products have different ingredients and different SPF protection. Plaintiff alleges no facts from which it could be concluded that benzene is systematically or routinely added to any Banana Boat® products – let alone to all Banana Boat® products. Had Plaintiff sustained any injury from the one Product she purchased that allegedly contained benzene, those she seeks to represent cannot be assumed to have sustained the same injury.

## CONCLUSION

The Court should affirm the district court's Order dismissing this action without leave to amend.

Date: July 14, 2023

Stinson LLP

s/ *Megan McCurdy*

Megan McCurdy
John Moticka
J. Emmett Logan
Ashley Crisafulli

*Attorney for Appellees Energizer Holdings, Inc., Edgewell Personal Care Company, Edgewell Personal Care Brands, LLC, Playtex Products, LLC, and Sun Pharmaceuticals, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55116

I am the attorney or self-represented party.

**This brief contains __12,992__ words,** excluding the items exempted by Fed.
R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.
32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
   Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
   only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ *Megan McCurdy*          **Date** July 14, 2023
*(use "s/[typed name]" to sign electronically filed documents)*